Board of Trustees Presentation November 10, 2015 Board of Trustees Meeting, Page 26 Robert Churn, City of Gretchen, N. extremist standard of care does not apply to a party when there is evidence of prior negligence by that same party. But what is that evidence? Let's look at the facts. On June 30, 2019, around 10.30, 10.45 in the evening, Clemson's captain, Captain Williams, was picking up a two-barge tow strung out at the First Street Wharf. The river that evening was running hot. As Captain Williams was approaching to face up the back of the most downriver barge, he observed a trash line hanging off of pilot number 21. It hung down at least to the surface of the river. He knew this was a hazardous condition, but he continued his approach nonetheless. After facing up to the barges, he began to work them out into the river. As he did so, the trash line hanging from the wharf fouled the Okaloosa starboard propeller. With the engine stalled, the current began to pull barges and tug out into the river. Captain Williams immediately sounded the abandoned ship alarm. His crew jumped off onto the First Street Wharf, but when he left the helm, number one, he left the starboard engine engaged. I'm sorry, the port engine engaged. But by then, the tug had moved too far away from the wharf for him to jump off as well, so he went out off onto one of the barges. As the Okaloosa and her tow drifted across and downriver toward the West Bank, she broke free of her tow, and they ultimately impacted the city of Gretna's water intake, Defender Dolphins. An emergency situation of a party's own creation cannot serve to lessen that party's duty of care, yet contrary to clear jurisprudence, the district court did just that. It diminished the reasonable standard of care for Captain Williams and that trash line. Counsel, was there any expert testimony about the standard of care, what a reasonable, trained, competent captain would have done under the circumstances? I know the testimony, his testimony, is that he saw the line, but was there any expert testimony that would have enlightened us as to what he should have done at that point? There were no navigational words of trial, Your Honor. The consequences of affirming the district court's decision here would be severe for two reasons. Number one, it would reduce the duty of care owed by masters and vessels in emergency situations that are caused by their own negligence. Second, it would open the door to the application of an an extremist standard of care to all actions, even those prior to or which caused the emergency situation. The end result would be a form of semi-immunity for masters who ignore known potential hazards that subsequently result in emergency situations, and it would broadcast a message to those masters that if they gamble and lose in choosing not to protect against known potential hazards, the ensuing emergency will only serve to lessen their potential viability, if not exonerate them entirely. So what is it that the captain should have done? The captain had a duty to evaluate all of his options under the situation and decide what the most... No, I really wasn't asking for you to explain the legal duty. You've carefully gone through all the facts for us. What should he have done? He should have taken steps to avoid... You still haven't answered the question. What should he have done specifically? He should have made the approach in a safer manner either by removing the trash line before he disembarked with the barges or found another way or another time to pick up those barges when he would not encounter that potential hazard of the trash line hanging down into the river. After the captain faced up to the barges, there was more than adequate time to send one of his crew members to remove that trash line hanging off the bar. He chose not to do so. The standard review before this court is... Give me a little bit of exactly what this appearance of this was. I'm approaching this with my bus on and I see them. I've got to walk there. I've got to visually picture that. Is the line as tight and just drop straight in the water or is there space between the dock and the water? The two barges were strung out facing up river on the first street wharf. There are bollards all down the first street wharf and bollard number 21 was at the rear of where the barges were tied off. When captain Williams faced up to those barges, that bollard was adjacent to where his tug was against the first street wharf. But how was that line strung down? It was hanging off the bottom. It was a ship's line that had, I guess, a loop at the top and it was hanging simply down into the water. What was the space between the on the inside space at the water? Is it open? Does it come straight down into the water and there's no space there or is it hanging out here and coming down? That's what I'm trying to picture. Follow me. If I'm understanding your Honor's question correctly, the line was essentially hanging right off the edge of the water. The standard review before this court is de novo. When a district court's finding of negligence is based on incorrect legal principle, such findings are disregarded and the clearly erroneous test does not apply. As such, this court must review the district court's negligence finding de novo because the court based its finding on an incorrect application of the in extremis legal principle. The district court's application of that incorrect legal standard in finding the flimsoll through captain Williams satisfied its duty of reasonable care is what's at issue in this appeal. In captain Williams's trial testimony, he clearly admitted that he saw the trash line as he approached and that he disregarded that potential hazard and that he proceeded towards it. That's in the record on appeal at pages 1227, 1237, and 1238. The fifth circuit is routinely held that the in extremis standard of care should not be applied to the actions of the captain who had ample time to avoid the peril. They did so in Bowdoin, they did so in Pillsbury, and they did so in Crescent City Towing. In Crescent City Towing, the court held that the in extremis standard must not be applied when the operator causes the emergency situation. In Bowdoin, the court held that the in extremis doctrine only applies to a vessel with which, without prior negligence, is put in the very center of disruptive natural forces. The district court said it was an unknown third party that caused it. Is that right? That's what the district court found, your honor. In Pillsbury, the court found the captain negligent because he was aware of a high fast river and of the care demanded under those conditions, but he proceeded into that river with loose rigging anyway. The court ultimately concluded the chug master did not, and this is the duty, critically evaluate his options to make a conscious decision that it would be safer to proceed with a loose tow than to delay his trip to ensure no barge was loose. Relevant facts in this case, as we've gone over, are that Captain Williams knew of the river conditions as he approached and before he faced up to the barges and then attempted to work them out from the first three wharfs. He also observed upon approach that the soon-to-be-fateful ship's line was hanging off the bollard down to at least the river's surface. Williams's own testimony was that a line hanging off the bollard into the water is a potential hazard, regardless of its length that's in the record on appeal at 1247. Ultimately, Plimsoll introduced no evidence of trial to show that Williams complied with the duty to critically evaluate the options to ensure tug and tow were not led into a dangerous situation. Under Senn Act, this court held that the duties of the tug with tow include the duty to keep a proper lookout. In Brown or Moot Marine Operators, the court held the moving vessel must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required. In Plimsoll Producing Company, the court held that when a mariner knows of obstructions to navigation, he must avoid them. In reaching this conclusion, the circuit cited the Fifth Circuit cited to Midiam Transportation Company which held that it was simple negligence for a tug and barge to approach shallows where the general location of submerged cables and a navigation channel were known. Plimsoll must be reasonable, not an extremist standard of care because it was the actor which created the emergency. As such, the presumption of fault under the Oregon or the Louisiana Rules was applicable and the question whether Plimsoll sufficiently rebutted that presumption remains. Because Plimsoll must be held to a standard of reasonable care, the improper application of the in extremis standard of care does not serve to rebut that presumption under the Oregon or the Louisiana Rules. Briefly, the Oregon Rule holds that there is a presumption of fault when a moving vessel who under her own power strikes a stationary object. The vessel is presumed to be at fault. The Louisiana Rule is basically the same rule in presumption of fault against the moving vessel except that vessel under the Louisiana Rule would be drifting, not under her own power. There are three ways to rebut that presumption of fault. The Pala Terminals Burnside LLC. Plimsoll could only rebut the presumption of its fault if it demonstrated one of three things. One, that the elision was the fault of the stationary object. Two, that the moving vessel acted with reasonable care or three, if the elision was an unavoidable accident. It did not demonstrate one or three and presumably demonstrated two based on the district court's holding that the moving vessel acted with reasonable care but under an extremist standard. Here the court found the presumption under the Rule of the Oregon was inapplicable because Plimsoll acted with reasonable care under the circumstances. However, the court reached that conclusion by applying the an extremist standard. As such, under Bowen, under Crescent Towing, the City of Britain submits to the district court applied an improper legal standard in finding that Plimsoll satisfied its duty of care. That's not the only basis on which to reversing the madness matter. There's also no clear line between where a warfinger's duty begins and where the mariner's duty ends. The primary guidance comes from the Bunch case, which held that the dock owner's liability should extend only so far as the vessel's master could not have averted an accident. In determining this standard, the Bunch court discusses two likely scenarios. First, when there's a condition that's open and obvious to those in charge of the vessel. In that situation, the warfinger is not required to warn as the actual knowledge of the obstruction or the condition. Second scenario is a hidden hazard or one that is or reasonably should be known to the warfinger, but cannot be known to the master in the exercise of ordinary care. In this situation, the warfinger is liable if they did not warn or if they do not warn the vessel of the condition of a hazard. The facts of this case are a little bit more nuanced. They create a mixture of both of these situations. First, the danger was open and obvious. We know this because Captain Williams admitted he saw the trash line. Second, as to the hidden aspect of the danger, Captain Williams could not have seen how far underneath the river surface the line went. The warfinger should have, and the exercise of the most reasonable and basic job there is, remove that trash line from the bollock to avoid harm, especially considering the fact that there was no way for a vessel to know, as Captain The line is both a hidden and a known hazard. While the line's existence was known, the depth of the line beneath the surface was the hidden hazard or the truly dangerous condition. We're not asking this court to find a new standard, and we agree with Empire to some extent that reasonable diligence is what was required at the wharf in this scenario. Under trade manner, reasonable diligence includes the duty to ascertain the condition of the berth, to make it safe, or warn the ship of any hidden hazard or deficiency known to the warfinger, or which in the exercise of reasonable care and inspection should be known to him and not reasonably known to the ship owner. Shouldn't then the exercise of reasonable care include removing a visible trash line, especially if there are employees working on the wharf when it exists? We wouldn't be here today if Empire had taken that most basic precaution, removing the trash line well within their duty of reasonable care. Under NRA Dearborn Marine Services, actionable negligence consists of failure to take precautions against foreseeable acts of third persons. On a cursory inspection, an employee could easily identify the line as a potential hazard. Since the depth of the line was unknown, simply removing the line would have been the most reasonable course of action. The warfinger's duty also extends to invitees. In that regard, it's important to note that the undisputed testimony from Empire and the court at trial was that they allowed vessels to dock at the First Street wharf on weekends as courtesy. Empire employees were working at the dock or at the wharf less than or approximately half a football field away when this incident occurred. It was a hazard, the trash line of an unknown depth, and simply by scanning the area, chosen to remove it. Again, the warfinger's duty under trade banner is to warn of any hidden hazard known or which in the exercise of reasonable care and inspection should have been known. As such, to some extent, Empire also owed and breached its duty to provide a safe berth. This brings us to the last point, which is that the district court did not consider comparative fault when it allocated 100 percent fault to the unknown third party that left the line on the ballot. Under combo maritime and United States versus reliable transfer, the application of the doctrine of comparative fault is required. On all of these grounds, the city of Gretna respectfully requests that this honorable court reverse and remand for further proceedings. All right, thank you, Mr. Chairman, and you've some time for rebuttal, Mr. Guy. May it please the court, Matthew Guy on behalf of the Port of New Orleans and the Empire of Stavridol. May it please the court, I think we'll pick up where Mr. Churin just left off on the duties of the warfinger, which we believe are well established as a matter of law, and really that dates back to the 1899 Supreme Court case Smith and Burnett, where the Supreme Court states very clearly, although the warfinger does not guarantee the safety of vessels coming to the wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berth there at, and if there is a dangerous obstruction, to remove it or give due notice. Now, in that case, the hazard that was being looked at was a submerged dangerous rock, something that had been there for a long-standing period of time, and that's a consistent theme of the warfinger liability cases, where there is an unknown hazard, is that they have been there for an extended period of time, they are known to the warfinger, and they are unknown to the If we look at the Pan American Grain versus Puerto Rico Port Authority case from the First Circuit, there the allegation, at least, is that there were submerged pilings, but with a hazard that the port knew about and didn't tell you, that failed as a matter of fact, but the allegation is that it had been there some period of time. The trade banner line that Grindler just cited there, that was a case concerning shallow water, something, again, that the warfinger would know about, could mark, and do something about to alert the approaching ship, but none of these are applicable in this case, because the stress throughout the cases, and again, with the Bonge case from the Fifth Circuit, is to use reasonable diligence, and in the case of the line in question on the wharf here, the evidence in the record was undisputed on this, that the line was not there at close of business on Friday, and that there was a line there on Sunday morning at the time this incident occurred, so it must have been put there at some point by an unknown vessel, most probably a tug called the Old Glory. How do we know this? Because we could look on the Mississippi River Transit information system that showed a tug called the Old Glory pulled up at the wharf and then left, and the line that was left there was a ship's line, which means not a mooring line, and again, the evidence undisputed was that Empire, the stevedoring company, uses only one kind of line. They are black, they are yellow, they are thinner, and the line that was left on the bollard here is clearly a ship's line left by a tug. Now, the point that the district court looked at with this was that the only evidence presented to the court was on the warfinger's duties, and what it did was that of the general manager, Mr. Dow, and his testimony was that the wharf was regularly cleaned and maintained, that Empire personnel would have removed the line had they seen it, that they had employees, two employees, whose duties were to regularly clean and sweep the wharf all day and to look out for things like that, and that it had in fact been cleaned the Friday before the incident. So that was the evidence before the district court. Nobody traversed that, nobody suggested that Mr. Dow was lying, and nobody produced an expert witness to say, well, that is not the standard of care that one would expect of a reasonable warfinger. Instead, one would expect them to have somebody monitoring 24-7 on the off chance that a passing tug might leave one of its lines there that would be a hazard to navigation. No expert evidence was put forward to say that those were the reasonable standards that one would expect of a warfinger, and the court just asked as to whether or not there were any navigational experts of what should the captain have done in this situation. The same is true with regard to the standard of care of a warfinger. No expert evidence was put forward to say that what Empire indisputably said that it did was somehow not reasonable, and that's the standard and the point that we make throughout our brief is that Gretna is really arguing for a standard of strict liability, that if there is a hazard that somehow emanates from the wharf, no matter how temporarily that was there, and no matter what the system the warfinger has in place for cleaning that wharf and ensuring that hazards are not there, then it is still liable. Gretna's response is, well, we never say strict liability, and that's true, they don't, but it's the only logical result from the standard that they're in these circumstances. So the question then that the district court was faced with, who was responsible for this, and concluded that the most likely party was the tug, the Old Glory, that had been seen there, and at that point all parties agreed that the line left probably by that tug caused the Okaloosa to lose control and go across the river, damaging at least allegedly the dolphins. But as Gretna just explained to the court, one thing that the district court seemed to get confused about was the in extremis standard on the part of the captain of the Okaloosa, and one can sort of understand why from having seen the master and in fact a couple of the crew members testify, that this is obviously a scary situation and one is reluctant to second guess decisions made by a mariner in distress. And certainly that's true after the propeller had been found, but the point is, and this is the point I believe that Gretna was just stressing, is that the dangerous situation was caused at least in part by the captain of the Okaloosa because he saw the line beforehand, he conceded that that was a potential hazard, and he should and could have taken steps to avoid that. This is important for another reason, not a thing mentioned by Gretna just now, is it comes to burden of proof, right? The burden of proof is on the Okaloosa as the vessel that ultimately ended up in the illusion to prove that it was not at fault. And that's difficult to square with the captain testifying that he saw the peril, recognized it as such, and took no action to avoid it. Now Gretna's second argument with regard to the warfare liability becomes circular. There Gretna's arguing that because the line caused the tragedy, caused the illusion, that axiomatically means that not removing the standard that's being addressed here. But going back to the Okaloosa's fault, it's presumed to be at fault, and it can rebut that presumption by showing that the illusion was the fault of a stationary object, well literally nobody's arguing that, or that the moving vessel acted with reasonable care, or that the illusion was an unavoidable accident. And two and three are really the same issue in this case, is it cannot have been an unavoidable accident if the peril that caused the accident was seen and observed by the master of the vessel beforehand, and yet he didn't take any action to get around that. And as was cited in the kiosk duty case earlier, the in extremis standard does not apply to the captain who had ample time to avoid the peril, which he did after the propeller had been found. And the fact that the master and all the crew were able to get off safely, and that there was no loss of life or injury in this is something for which we should all be grateful for. But we can second guess the captain for having seen the peril and not actually taking the steps to avoid it. The district court would say was correct that there's certainly no evidence presented on the part of a fault on the part of the port or of Empire of a wharf injure. Empire demonstrated that it took reasonable steps to maintain the safety of the wharf and no evidence was introduced to contradict that, factual, expert, or otherwise. District court was probably correct that the line was most likely left there by a tug that had simply forgotten it and passed on, but that's really of no moment. That party wasn't sued and was never in the case, so we never got to know about it. One last thing is that there was a question from the court about what the line looked like. If I can just refer to the record excerpts from Gretna, one can see it's hanging down there into the water. Now part of the district court's conclusions were based on the fact that nobody knew how far underwater the line went because it was dark. I'm not sure you'd be able to see it even if it was bright and sunny, but that's neither here nor there. The captain saw it and he could have avoided it and he didn't. Empire had no knowledge that it was there. If it had, it would have removed it and as such it clearly acted reasonably. Unless I can assist the court further. Yes, thank you Mr. Mack. Mr. Swayne. Good morning and thank you, your honors. Fred Swayne on behalf of Windsor Marine and may it please the court, I'd like to respectfully start with a full stop. The presumptions don't apply. Whether it's the Oregon, the Louisiana, the Pennsylvania, whatever it may be, consistent with the district judge's findings, consistent with combo maritime, consistent with midship towing, there was no void of evidence here. There was no fact, there was no mission as to what occurred. When the captain got caught at first, he didn't know what happened. It took an investigation to figure that out, but at trial there was no vacuum. The presumptions specifically do not apply and that's what the district court found. The burden is on the appellant. The burden is on the city of breadth and they have the ordinary burden to show duty, breach, negligence, causation, and they have utterly failed to do that in this case. The next point is that Judge Malazzo specifically found that the three days of testimony when the credibility, including of Captain Williams, that he was not at fault, not at fault. So the in extremis standard, if the captain is not at fault, it applies. Only if she had found that the captain was at fault could there be an argument that the in extremis standard was misapplied, but it wasn't. She specifically found that the captain was totally free of fault. So that is a fatal flaw. Judge Inglehart, there was another captain that testified that said that the actions of Captain Williams were perfectly reasonable and that he actually saved lives. That's what the proof felt. He saved lives in this process. And just to describe that real quick, I don't know if your honor had a chance to get that gauge, but he saw the line a hundred plus feet away from where he was maneuvering. He went in a different direction. He went into the river and when he did that, his engine locked up. He didn't know why and he couldn't get away. The old ferry was just south of him with a right bow. In his opinion, that tug was going to go under the ferry, potentially killing all the souls aboard. So he immediately called to get off the ship for his crew who were able to still jump to the wharf. Pretty intense. Then he stayed up there trying to get it in gear and trying to get the other engine to work so that he could avoid the ferry so the vessel wouldn't go under. When he tried doing that for a second, he realized he doesn't know if he can make it happen. So he left it in gear. Fortunately, he did because what went into the river. He then went out onto the coves, thinking that's the best spot for him to get saved. That's the best spot for him to get recovered. And that's how the incident actually happened. He never said that he thought that the line on the pollard was a hazard to him. When pressed at trial, this debate about whether it could have potentially been a hazard was discussed, but he never knew it was a hazard to him. That's consistent with Judge Malazzo's comments. Let's look a little bit more at the facts. There's no way for him to know whether that line, a hundred feet away, was hanging to the waterline, below the waterline, somewhere out the middle of the Mississippi. It didn't matter whether it was night or day. You can't see it in the Mississippi River. But the appellants then suggest that the captain simply turned and ran over the line, suggesting that he saw it, suggesting that he made a decision, suggesting it was like every other case they cite. A plotted pipeline, a hurricane, a latent defect, a failure to inspect, loose rigging. None of that applies in this case. Those are all the cases that the appellants have cited. Captain Williams was where he was supposed to be, doing what he was supposed to do by invitation of the court and by empire. And they shouldn't have had that trash line there. And they did have a duty to warn because it wasn't open and obvious. Judge Malazzo found it wasn't open and obvious. They had a duty to warn. They didn't, and they were operating at the time, and the video footage supports that, despite the corporate representative's original testimony. The district judge specifically found observing the line was not determinative of a hazard. The line was not in no peril to Captain Williams. It was latent. It was hidden. It was below the waterline. It was not open and obvious. The appellants bring up certain other factors that they say are somehow relevant. High river. Well, the captain testified it really wasn't that high. And this is essentially in South Louisiana. It's a norm that you'd have high river in recent years. They don't stop these type of operations. Most importantly, there's no facts that were demonstrated at trial to suggest high river had any real part in this, except once the engine was lost, it made things more difficult, right? But it didn't lead, it didn't, it wasn't part of the cause of the incident. They next sent to the barge configuration. Again, there was another captain. There were experts who testified. There was nothing wrong with the barge consideration. It was too strong a barge. Just it was supposed to be. It was going to pull up on the back, get them, go out into the river, and go to where he needed to get them. It was customary practice to do it that way. And again, on high river, there were no notices from the Coast Guard, nothing that triggered any type concerns or anything like that. They also, as you just mentioned, duty to keep a look at it. Captain Williams says he saw it from 100 feet away. There were crew members on the boat too. There's nothing about a failure to keep a look at it. You couldn't see that line below the Mississippi water, wherever it was floating around. You couldn't see it, and that was proven at trial. The bottom line is that Captain Williams minimized the damages and saved lives, and that's consistent with the testimony. This could have been a much, much worse situation. The district judge is a trier of fact. There were three days of testimony. Weigh the testimony, the credibility of the witnesses, and determine that Captain Williams did not cause the inextremis situation. That requires evidence. Guess what else it also requires, your honors, is that this is not maneuver. These are fact findings that Judge Malazzo found to say that the captain wasn't at fault. Then she applies the inextremis standard. It's not that she applied the standard wrong, based on her factual analysis of the trier of fact. It applies exactly as she applied it. So any problems that the court would have, as the factual findings after the three days, after weighing all the testimony, is definitely a clearly erroneous standard. This is not a de novo case, not on this appeal. The other point that the city of Gretna makes is that the district court misunderstood the evidentiary requirements that the elision was unavoidable. That goes back to the presumptions that you heard counsel mention, that you either have to show that you acted reasonably or that it was an unavoidable action. Presumptions don't apply. They're burdened. The court is very clear about this. The city says that the captain took no action to avoid the line. They did. He started 100 feet away. He wasn't operating in that exact area and he was leaving the wharf to go out into the river without any understanding that that would have been blocking his path. He did not run across the line, as they suggest. They say that after a foul, he ordered abandon ship and this was an emergency situation. His actions were actually fairly heroic. He got his crew off. He did what he could to avoid the situation and when he got to a point where he couldn't no longer guarantee his safety, he went to where he was in the most safe position of saving all the other souls on the vessel. Remember, no one was hurt in this incident at any point. East bank, west bank, crew, anybody else. For that matter, we dispute that the city of Gretna has any damages, which I know is not specifically before the court, but it's definitely something that may have been a part of this overall decision. Another issue, your honors, is that the appellant wants to say that Captain Williams should have had knowledge of a concern and of foreseeability when he saw this, right? They're totally passing up the fact that this wasn't put there by Captain Williams. This was a third party, so they're giving the third party a pass. They're seeing the third party. They didn't need to have any foreseeability in this, but Captain Williams did. It's inconsistent. It doesn't make sense. There's no superseding causes. There's no mention of that by Judge Malazzo and in order for that, you would need to show the negligence of the defendant and a substantial connection, causation. They didn't prove it. Judge Malazzo clearly found they didn't prove that. They have 40 plus findings of that that are very well reasoned. You say that the Oregon rule doesn't apply regarding the presumption of fault against a moving vessel? That's correct. So, your honor, for much of the maritime history that presumptions were in place for certain reasons when you couldn't otherwise discover facts, Conval Maritime and Mid-South Towing make it very clear that if there's not that fault, if there's not that absence, if it's not a mission, you don't need the presumptions. You take it as you ordinarily would under the GML, under an ordinary standard. Judge Malazzo specifically cites that in order and finds that because there were no facts that were missing here. It wasn't like you had a major gap in the incident that couldn't be decided to say, okay, well, they hit you, so that presumption goes to the vessel. It didn't happen here. They absolutely don't apply. We've seen them in all the briefs. We've heard them argued before, but they do not apply, and Judge Malazzo found that to be the case. You know, as far as public policy, your honors, I mean, saying that Captain Williams had the burden in this case, well, you better start stopping traffic all up and down the Mississippi River because if this was a 150-foot line or a 200-foot line at the port left doing it, then you couldn't have anybody come in the center of the river. Your time has expired now, Mr. Chairman. Oh, your honor, thank you very much. Briefly addressing the arguments raised by the athletes, the city of Gretna, with respect to empire and the port, is not arguing for strict liability. The city of Gretna is simply arguing that because empire and the port were aware of and knew that river tugs used that wharf on the weekends, and those river tugs were invitees, and the orphanage's duty extends to invitees, that it had the same duty of reasonable diligence as it did from 9 to 5, Monday through Friday. That duty is to provide a safe berth and to warn of hidden In this instance, the exercise of reasonable care, the presence of that line should have been known with respect to Flensol's arguments. The bottom line when it comes to the application of the Antextremist Standard of Care is, was this a scenario under which there is clear precedent for that application? All of the main primary applications of the Antextremist Standard of Care, or at least the analysis of whether to apply that standard of care, are in instances where vessels are put into the very center of truly destructive natural forces. If we go back to the Boudouin case, 1957, that destructive natural force was Hurricane Auburn. If we go back to the Crescent Towing case, just 2010, that destructive natural force is Hurricane Katrina. But even in that case, in Crescent Towing for instance, the Antextremist Standard did not apply. The reason it didn't apply is because the master of the vessel in question in that case chose to navigate his vessel into New Orleans as Hurricane Katrina was approaching, when he had more than adequate information to more reasonable course of action. Likewise in Boudouin, that was another hurricane that was heading up straight for Cameron, Louisiana. The Tidewater 5 was tied off on a dock less than three feet above sea level. More than one weather report came through, and the court goes through each and every one of them, more than one weather report came through saying there were going to be tides in excess of three to five to nine feet by the time Hurricane Auburn finally struck. Yet nobody moved the Tidewater 5. Ultimately it broke free of its moorings, and there were lives lost in that instance. The Antextremist Standard of Care did not apply there because the master had an option, failed to consider that option, and ultimately the emergency scenario ensued. This case is no different. Here we have a captain who saw a known potential hazard in a line hanging down into the towards that line. Maybe he got it. He might have gotten lucky. Maybe nothing would have happened, but we wouldn't be here today if that was the case. Something did happen. What happened is as he was working the tugs or the barges out from the wharf, he ended up catching that line in his propeller. It stalled his engine, and then the river took over. The boat and the barges both spun across the river. They impacted the city of Gretna's There's no question about that. They have yet to be repaired to this day. The only question is why the Antextremist Standard of Care was applied when a simple act of removing the trash line, be it by the morphinger or by the master, could have avoided this entire thing. Thank you, Mr. Chairman. Your case and all of today's cases are under submission, and the court is in recess until nine o'clock tomorrow.